

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-216-CV

DANIEL L. FOSTER, D.O.                                         APPELLANT

V.

MARY RICHARDSON                                               APPELLEE

------------

FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

In this interlocutory appeal concerning the adequacy of an expert report filed in a health care liability claim under chapter 74 of the civil practice and remedies code (chapter 74),[1] appellant Daniel L. Foster, D.O. contends in one issue that the trial court erred by denying his motion to dismiss. We affirm in part and reverse and remand in part.

---

[1] See Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (Vernon 2005 & Supp. 2009).

## Background Facts

### Facts alleged in Richardson's petition

Appellee Mary Richardson injured her left leg while working for an airline in December 2006. Hospital personnel immobilized her knee, initially told her that she had sustained a knee sprain, and instructed her to see her primary physician for treatment. Richardson's primary physician referred her to Dr. Angelo Otero for an orthopedic consultation.[2] On January 22, 2007, Dr. Otero diagnosed Richardson with tears of her anterior cruciate ligament (ACL) and lateral meniscus in her left knee. On February 15, Dr. Otero surgically reconstructed that knee; he then released her for light duty at work on February 26 and for full duty on May 14.

On June 21, because she was still experiencing pain in her leg, Richardson saw Dr. Foster,[3] who diagnosed her as having complex regional pain syndrome in her left leg and recommended that she participate in physical therapy. However, on July 27, Richardson saw an orthopedic surgeon whose

---

[2] "Orthopedics" (or "orthopaedics") is the "medical speciality concerned with the preservation, restoration, and development of form and function of the musculoskeletal system, extremities, spine, and associated structures by medical, surgical, and physical methods." Stedman's Medical Dictionary 1383 (28th Ed. 2006).

[3] The record does not indicate who referred Richardson to Dr. Foster.

2

diagnostic tests revealed that Richardson had a partially-healed ankle fracture. To treat the fracture, the surgeon had to rebreak Richardson's ankle and insert metal hardware into it. Richardson asserts that her leg is disfigured and that her ankle will never function normally because of Dr. Otero's and Dr. Foster's failures to timely diagnose and treat the fracture.

Procedural history

Dr. Foster and Dr. Otero[4] answered Richardson's allegations, and then Richardson served both defendants with the expert report and curriculum vitae of Bryan S. Drazner, M.D. concerning their alleged deficiencies in providing Richardson's care, as required by section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351. Dr. Foster filed a motion to dismiss under chapter 74, claiming that Dr. Drazner's report is deficient. After the trial court heard arguments from the parties, it denied Dr. Foster's motion. Dr. Foster filed his notice of this interlocutory appeal. *See id.* § 51.014(a)(9) (Vernon 2008); *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008).

---

[4] The claims against Dr. Otero are still pending and are not at issue in this appeal.

### The Adequacy of Dr. Drazner's Expert Report

In one issue, Dr. Foster asserts that the trial court erred by denying his motion to dismiss and concluding that Dr. Drazner's expert report complies with chapter 74.

#### Standard of review

We review a trial court's denial of a motion to dismiss under section 74.351 for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Collini v. Pustejovsky*, 280 S.W.3d 456, 461 (Tex. App.—Fort Worth 2009, no pet.) (op. on remand); *Moore v. Gatica*, 269 S.W.3d 134, 139 (Tex. App.—Fort Worth 2008, pet. denied) (op. on remand). We also review a trial court's decision on whether a physician is qualified to offer an expert opinion in a health care liability claim under an abuse of discretion standard. *Collini*, 280 S.W.3d at 461; *Moore*, 269 S.W.3d at 139.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986); *see Collini*, 280 S.W.3d at 461. Merely because a trial court may decide a matter within its discretion

4

in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 242; *Collini*, 280 S.W.3d at 461. A trial court does not abuse its discretion if it commits a "mere error in judgement." *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Collini*, 280 S.W.3d at 461.

The statutory requirements of expert reports

A plaintiff must serve an expert report that addresses liability and causation on each defendant no later than the 120th day after the plaintiff files a health care liability claim. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j). If an expert report has not been served on a defendant within the 120-day period, then on the motion of the affected defendant, the trial court must dismiss the claim with prejudice and award the defendant reasonable attorney's fees and costs. *Id.* § 74.351(b). A report "has not been served" under the statute when it has physically been served but a court finds it deficient. *See id.* § 74.351(c); *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008); *Lewis*, 253 S.W.3d at 207–08.

A report is deficient (therefore subjecting a claim to dismissal) when it "does not represent an objective good faith effort to comply with the [statute's] definition of an expert report." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*);

*Collini*, 280 S.W.3d at 461–62. While the expert report "need not marshal all the plaintiff's proof," it must provide a fair summary of the expert's opinions as to the applicable standards of care, the manner in which the care rendered by the physician failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 878; *Collini*, 280 S.W.3d at 462.

To qualify as a good faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875; *Benish v. Grottie*, 281 S.W.3d 184, 194 (Tex. App.—Fort Worth 2009, pet. denied). A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Palacios*, 46 S.W.3d at 879; *Benish*, 281 S.W.3d at 194.

The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879. The expert report must "contain sufficiently specific information to demonstrate causation beyond mere

conjecture." *Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.*, 224 S.W.3d 448, 453 (Tex. App.—Fort Worth 2007, no pet.).

The facts alleged in Dr. Drazner's report

According to his report, Dr. Drazner physically evaluated Richardson on July 26, 2007, and he became concerned about aspects of her prior care at that time. During his examination of Richardson, he noticed a "profound range of motion deficit of the left ankle, left ankle edema, and left calf pain prior to the receipt of diagnostic testing." He also reviewed Dr. Foster's and Dr. Otero's records of Richardson's treatment.

Dr. Drazner's report recites that after Richardson's initial injury in December 2006, hospital personnel examined her left foot, ankle, and knee, and they "inexplicably opined" that she had a knee sprain or strain, without "any positive findings about the knee objectively." Dr. Otero examined Richardson about a month later by taking x-rays that, although resulting negative, led Dr. Otero to conclude that there was an "acute tear of the [ACL]." Dr. Otero ordered an MRI scan, but the scan did not reveal signs of an ACL tear, and it only showed minor abnormalities about the knee's meniscus that existed because of knee surgery that Richardson had previously received. Thus, the report alleges that Dr. Otero operated on Richardson's knee without an

7

adequate medical basis and despite Richardson's complaints to him about pain in her ankle.

The report continues by describing Richardson's attempt to get a second opinion about her pain from Dr. Foster after Dr. Otero's surgery. It states in relevant part,

> Although Dr. Foster noted that Ms. Richardson's left calf was smaller than her right calf, and superficial tenderness to palpation, Dr. Foster did not perform a range of motion on Ms. Richardson's left ankle or identify the ligaments that he examined. Dr. Foster diagnosed Ms. Richardson's problem as "complex regional pain syndrome of the left lower extremity." Dr. Foster arrived at his opined diagnosis, failing to document the hallmarks of the condition, well delineated in the [American Medical Association] Guide, Fifth Edition, to include hypersensitivity to light touch, withdrawal behavior, hyperhidrosis, hyperfusion, mottling and hair and nail bed changes.

> The Standard of Care Applicable to both Dr. Otero and Dr. Foster:

> It is the standard of care for a physician who is examining a patient's leg injury to perform a thorough [orthopedic] examination in order to determine the nature and extent of the injury. It is also the standard of care when examining a leg injury, to perform full range of motion testing regarding the injured leg, including the knee, the ankle, and the foot, and to detail the findings of the examination. . . .

> Breach of Standard of Care:

> From their records, neither Dr. Otero nor Dr. Foster performed a thorough examination of Ms. Richardson's left leg, including her ankle and foot. . . . Without a complete [orthopedic] examination, including full range of motion testing, and the obtainment of appropriate objective diagnostic tests on Ms. Richardson's ankle

8

and foot, an accurate diagnosis was not possible. . . . Although Ms. Richardson may have sprained her knee, it was later discovered (not by Dr. Otero or Dr. Foster) that Ms. Richardson had fractured her left distal fibula. Nevertheless, . . . Dr. Foster had ignored the patient's complaints of calf pain and tenderness, . . . attributing her complaints as a complication of the knee surgery performed by Dr. Otero.

Results of Defendants' Breach of the Standard of Care:

. . . If Dr. Otero and Dr. Foster had performed a complete examination of Ms. Richardson's left leg, including her tibula/fibula, ankle and foot, and/or if they had referred Ms. Richardson for a second opinion, while treating her conservatively to determine the true nature of her injury, an unnecessary knee surgery would not have been performed. Moreover, due to the physicians' failure to correctly diagnose Ms. Richardson's injury, her fracture went completely undetected for over seven months and the patient was subjected to . . . a prolonged period of pain and requirement for exhaustive narcotic enalyens, usage of a bone growth stimulator and another surgery to remove painful surgical hardware, a prolonged period of disability, and . . . loss of hind foot motion, . . . as well as moderate chronic pain. As a result, it is my opinion that Ms. Richardson will suffer from impairments that could have been prevented had her injury been properly and timely diagnosed and treated before the fracture ~~had healed incorrectly~~ failed to heal, moved to non-union, and required further exhaustive care.[5]

---

[5] ... The words "failed to heal, moved to non-union, and required further exhaustive care" are hand written.

The adequacy of Dr. Drazner's report as to causation

In the first part of his only issue, Dr. Foster contends that Dr. Drazner's report is deficient because Dr. Drazner's statements related to the cause of Richardson's injuries are factually unsupported and inadequately explained and because the report does not differentiate Dr. Foster's and Dr. Otero's actions that allegedly contributed to Richardson's injuries.[6]

The factual explanation of causation

Dr. Foster asserts that Richardson's allegedly unnecessary knee surgery cannot have any causal link to Dr. Foster's diagnosis because Richardson's petition and Dr. Drazner's report establish that Dr. Foster first saw Richardson about four months *after* the surgery. Dr. Foster also argues that Dr. Drazner's report "makes no attempt to explain how Dr. Foster's alleged breach—the one month delay in diagnosis that occurred six months after the injury—had any causal relationship with the corrective [ankle] surger[ies] performed a little over one month later."

---

[6] ... Some of Dr. Foster's contentions during oral argument regarded the alleged vagueness of Dr. Drazner's statements regarding Dr. Foster's standards of care. But Dr. Foster's argument in his brief concerns the adequacy of Dr. Dranzer's report as to causation, not standards of care, and we will not consider whether the report was adequate as to standards of care. *See* Tex. R. App. P. 39.2 (explaining that the purpose of oral argument is to clarify the written arguments in briefs); *El Paso Natural Gas Co. v. Strayhorn*, 208 S.W.3d 676, 681 (Tex. App.—Texarkana 2006, no pet.).

10

Richardson says that these arguments misunderstand "the nature of the claims brought against Foster" and represents in her brief that her claims against Dr. Foster are based on "other injuries caused by his negligence," specifically referring to her pain caused by Dr. Foster's failure to properly diagnose and treat the ankle injury. Undoubtedly, Dr. Foster is correct that he could not have caused Richardson's knee surgery, and Richardson has acknowledged this fact. However, while Richardson's petition alleges that both doctors' acts, "singularly or in combination, were a proximate cause" of her damages that include expenses for medical care that could relate to the knee surgery or the ankle surgeries (to initially treat the ankle fracture and to remove the surgical hardware), the petition also asks for damages related to physical pain and mental anguish suffered in the past and to be suffered in the future and physical disability and disfigurement suffered in the past and to be suffered in the future.

Dr. Drazner's report explains that Dr. Foster's alleged misdiagnosis caused Richardson to suffer "a prolonged period of pain" and "a prolonged period of disability." Thus, assuming that Dr. Drazner correctly concluded that Dr. Foster's diagnosis of complex regional pain syndrome was erroneous and that he should have diagnosed her with an ankle fracture, Dr. Drazner's report links

11

Richardson's continued pain and disability related to the fracture[7] to Dr. Foster's erroneous diagnosis for as long a period—here, more than a month—until her condition was correctly diagnosed and treated.

Nonetheless, Dr. Foster relies on a recent San Antonio Court of Appeals opinion to argue that Dr. Drazner's report is still insufficient in explaining causation even if it shows that Dr. Foster's misdiagnosis induced Richardson's continued pain and disability. *See Jones v. King*, 255 S.W.3d 156 (Tex. App.—San Antonio 2008, pet. denied) (mem. op.). In *Jones*, King, who suffered from chronic pain, alleged that Dr. Jones's allegedly improper treatment—the placement of a morphine pump—caused her to develop several health problems, including meningitis. *Id.* at 158. Dr. Jones, an anesthesiologist, alleged that the expert report written by Dr. Gregory Powell did not adequately address the causal connection between breaches of standards of care and King's injuries. *Id.* The San Antonio court explained that the report contained "little more than a series of repetitious conclusory statements" such as, "the failure to timely detect the meningitis and treat it for more than forty-eight hours caused it to become worse and resulted in

_____

[7] ... Dr. Drazner's report alleges that Richardson complained of pain when she saw Dr. Foster in June 2007.

12

numerous additional complications and injuries including decreased vision, diabetes insipidus, and pain." *Id.* at 159. The majority opinion said,

> [A] close reading of the relevant portions of the report confirms Powell's failure to link any delay in diagnosis to any additional pain and suffering or exacerbation of the meningitis than what would have occurred in the face of an earlier diagnosis.
>
> Stated another way, while it may be facially appealing to infer additional pain and suffering resulted from the alleged delay in diagnosis, the trial court is not permitted to rely on such speculation in determining the adequacy of the report. *While Powell clearly states King suffered "extra" or "additional" pain and suffering due to the 48-hour delay in diagnosis, he fails to provide any baseline from which the trial court could conclude the delay caused the results.* Powell does not explain what facts led him to his conclusions. *His report does not indicate the normal or expected course of meningitis once treatment has begun. Does meningitis become more difficult to treat or take longer to resolve if treatment is delayed?* Does the disease become more virulent due to lack of treatment? While Powell also states King was "hospitalized twice," "lost over thirty days at work," and "incurred a substantial amount of medical bills during the hospitalizations," he does not attempt to explain how these results would not have occurred if the diagnosis of meningitis had occurred 48 hours earlier. . . .
>
> . . . Here, Powell offered no medical explanation about whether earlier treatment would have been effective in *shortening the duration of the meningitis*, precluding additional pain and suffering, or preventing other alleged injuries and damages.

*Id.* at 159–60 (citations omitted and italic emphasis added).

However, unlike the expert report at issue in *Jones*, which, according to the majority opinion, did not explain how a delay in diagnosis lengthened King's

13

pain by delaying the resolution of her meningitis, Dr. Drazner's report does explain how Dr. Foster's alleged failure to "determine the true nature of [Richardson's] injury" left her ankle fracture untreated and subjected Richardson to prolonged pain. Thus, we conclude that the facts in *Jones* are distinguishable from those involved here.

However, even if the *Jones* opinion could be read to render a report inadequate on causation when the report sufficiently links a misdiagnosis to pain that is prolonged until a correct diagnosis is made and the correct treatment is given, we disagree with the opinion. *Cf. Moore v. Sutherland*, 107 S.W.3d 786, 791 (Tex. App.—Texarkana 2003, pet. denied) (holding that an expert report based on a doctor's misdiagnosis is sufficient as to causation when it specifically states what the defendant "should have done and what happened because he failed to do it"); *see also Sullivan v. Methodist Hosps. of Dallas*, 699 S.W.2d 265, 274–75 (Tex. App.—Corpus Christi 1985) (holding that the failure to diagnose the presence of a sponge in an abdomen sufficiently caused the plaintiff's injury when the plaintiff suffered from "additional physical suffering"), *writ ref'd n.r.e.*, 714 S.W.2d 302 (Tex. 1986). For these reasons, we hold that, to the extent that Richardson's claim against Dr. Foster concerns her prolonged pain because of his alleged misdiagnosis, the trial court did not abuse its discretion by denying Dr. Foster's motion to dismiss based on his

14

allegation that Dr. Drazner's causation opinion is factually unsupported or inadequately explained. *See Palacios*, 46 S.W.3d at 875.

However, to the extent that Richardson's claim against Dr. Foster asserts that his alleged misdiagnosis caused her to require ankle surgeries and caused the other alleged harmful conditions related to the surgeries,[8] we conclude that Dr. Drazner's report provides a deficient explanation of causation. *See Farishta*, 224 S.W.3d at 453, 455 (indicating that an expert report must provide an adequate explanation of causation as to each injury claimed by a plaintiff and affirming the trial court's dismissal of particular damage theories that the expert report had not adequately addressed); *see also Benson v. Vernon*, No. 10-08-00271-CV, 2009 WL 2462657, at *3 (Tex. App.—Waco Aug. 12, 2009, no pet.) (citing *Farishta* and holding similarly). Dr. Drazner's report says that Richardson required "narcotic enalyens" and "usage of a bone growth stimulator and another surgery to remove painful surgical hardware" and suffered "loss of hind foot motion and injury to the superficial peroneal nerve, as well as moderate chronic pain" because her ankle had "failed to heal, moved

---

[8] Despite Richardson's statement in her brief that Dr. Foster misunderstands the nature of her claims, Richardson claimed at trial in her response to Dr. Foster's dismissal motion and also claimed at oral argument on appeal that the delay caused by Dr. Foster's alleged misdiagnosis contributed to the need for her two ankle surgeries. Dr. Drazner's report also asserts such a conclusion.

15

to non-union, and required further exhaustive care." But Dr. Drazner's report does not identify how Dr. Foster's alleged misdiagnosis in June 2007, which caused about one month's delay in correctly diagnosing the ankle injury after the correct diagnosis had already been delayed for about six months since the initial injury in December 2006, contributed to the requirement of such exhaustive care. In other words, the report does not explain beyond mere conjecture how the condition of Richardson's ankle worsened from June 2007 to July so that Dr. Foster's failure to give a correct diagnosis in June caused the requirement of further treatment in July that would not have otherwise been required if Dr. Foster had correctly diagnosed the injury. *See Farishta*, 224 S.W.3d at 453, 455. Thus, we hold that the trial court abused its discretion to the extent that it found that Dr. Drazner's report provided a sufficient explanation about Dr. Foster's actions causing Richardson's ankle treatment. *See Palacios*, 46 S.W.3d at 875. We sustain Dr. Foster's sole issue as to that limited basis.

The report's collective referrals to Dr. Foster and Dr. Otero

Next, Dr. Foster argues that Dr. Drazner "failed to explain how each defendant specifically and individually caused or contributed to Richardson's injury" and that the report's alleged "collective assertions of negligence" are inadequate because Dr. Drazner "merely prefaces every sentence regarding

16

causation with both doctors['] names." He cites several cases to propose that expert reports must differentiate the conduct of multiple defendants. *See, e.g., Longino v. Crosswhite ex rel. Crosswhite*, 183 S.W.3d 913, 917 (Tex. App.—Texarkana 2006, no pet.) (holding that a report was deficient because it did not contain "specific information concerning how [one doctor] breached the standard of care apart from [another doctor's] conduct" when the plaintiff's complaint concerned the doctors' joint treatment decision while the patient suffered from bacterial meningitis); *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244–46 (Tex. App.—Corpus Christi 2004, no pet.) (holding that a report was deficient because it did not "present the standards of care relevant" to each defendant or distinguish among several defendants concerning how breaches of their standards of care contributed to an alleged failure to diagnose and treat a heart condition).[9]

Here, unlike in *Longino* and *Taylor*, the report explained that Dr. Otero's treatment of Richardson was independent of and attenuated in time from Dr.

---

[9] Dr. Foster also relies on the El Paso Court of Appeals opinion in *Murphy v. Mendoza*, 234 S.W.3d 23, 29 (Tex. App.—El Paso 2007, no pet.). That case is inapposite because the report did not even identify the defendants by name when referring to their allegedly incorrect evaluations of a bladder biopsy, so it could not have discussed the standards of care related to both doctors "if the roles and responsibilities differed." *Id.*

Foster's diagnosis. Dr. Drazner's report connects Dr. Foster's actions to Richardson's delay in receiving proper treatment for her ankle fracture by stating (in a paragraph that is independent from any discussion of Dr. Otero),

> Although Dr. Foster noted that Ms. Richardson's left calf was smaller than her right calf, and superficial tenderness to palpation, Dr. Foster did not perform a range of motion [test] on Ms. Richardson's left ankle or identify the ligaments he examined. . . . Dr. Foster arrived at his opined diagnosis, failing to document the hallmarks of the [complex regional pain syndrome] condition.

The report further states in its standard of care section of "both Dr. Otero and Dr. Foster" that (1) orthopedic examinations should include a full range of motion test regarding the knee, ankle, and foot, and that a doctor should detail the results of the test, and (2) if a doctor cannot objectively diagnose the source of pain, the doctor should refer the patient for a second opinion.

The report then alleges that both doctors breached the standard of care through their separate treatment of Richardson's injury. The report refers to the doctors collectively, in part, by stating that "neither Dr. Otero nor Dr. Foster performed a thorough examination" because they both did not complete full range of motion testing and they therefore failed to diagnose the ankle fracture. It also refers to the doctors collectively by stating as to causation, "[D]ue to the physicians' failure to correctly diagnose Ms. Richardson's injury, . . . [she] was subjected to . . . a prolonged period of pain."

18

However, we cannot agree with Dr. Foster's assertion that the report was required to say in a separate sentence within its standard of care section that Dr. Foster needed to and failed to perform the range of motion test (rather than alleging that same fact within a sentence that also mentioned Dr. Otero) because the report had previously independently explained why Dr. Foster should have performed the test. We also cannot agree that the report needed to use a separate sentence to explain how Dr. Foster's conduct delayed the correct diagnosis of Richardson's ankle injury and thus prolonged her pain when that was adequately indicated by the rest of the report. Thus, we conclude that Dr. Drazner's report is not deficient merely because it contains some collective statements regarding actions that both doctors should have taken while they independently cared for Richardson. *See Barber v. Dean*, No. 02-07-00353-CV, 2009 WL 3490952, at *10 (Tex. App.—Fort Worth Oct. 29, 2009, no pet. h.) (holding that a report is not deficient for grouping defendants together when it specifically states that they all owed the same duty of care); *Livingston v. Montgomery*, 279 S.W.3d 868, 873 (Tex. App.—Dallas 2009, no pet.) (explaining that "the fact that [the report] identifies one standard of care for more than one defendant does not render [the report] deficient"); *Sanjar v. Turner*, 252 S.W.3d 460, 466–67 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding the same and noting that nothing "forbids applying the same

19

standard of care to more than one physician if . . . they all owed the same duty to the patient").

Thus, we hold that the trial court also did not abuse its discretion by denying Dr. Foster's motion to dismiss Richardson's claim on the basis that portions of Dr. Drazner's report referred to the doctors' conduct collectively. *See Palacios*, 46 S.W.3d at 875.

Dr. Drazner's qualifications

In the final part of his sole issue, Dr. Foster contends that Dr. Drazner is not qualified to submit an expert report on causation. An expert report authored by a person who is not qualified to testify cannot constitute an adequate report. *Collini*, 280 S.W.3d at 462; *see Ehrlich v. Miles*, 144 S.W.3d 620, 624–26 (Tex. App.—Fort Worth 2004, pet. denied). The proper inquiry concerning whether a doctor is qualified to testify is not his area of practice but his familiarity with the issues involved in the claim before the court. *Collini*, 280 S.W.3d at 464; *see Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

To be qualified to submit a report on the causal relationship between the breach of a physician's standard of care and harm, the reporting physician must be "otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." Tex. Civ. Prac. & Rem. Code Ann.

20

§ 74.351(r)(5)(C); *see* Tex. R. Evid. 702 (explaining that if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion"); *Collini*, 280 S.W.3d at 465.[10]

To be so qualified under rule 702, an expert must have knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *Thomas v. Alford*, 230 S.W.3d 853, 857, 860 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that because the doctor who submitted an expert report did not demonstrate knowledge of cancer treatment, he was not qualified to offer an opinion that an earlier diagnosis could have produced a better outcome for

---

[10] The parties discuss sections 74.351(r)(5)(A) and 74.401(a) of the civil practice and remedies code, which relate to the expert qualifications to submit an opinion "regarding whether a physician departed from accepted standards of medical care." *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.351(r)(5)(A), 74.401(a). However, Dr. Foster has not directly challenged Dr. Drazner's qualifications in that regard—the heading on his qualification challenge in his brief is "Drazner is Not Qualified to Provide Adverse Causation Opinions," and the analysis in his brief also focuses on causation. Thus, we will focus on the qualification standards under section 74.351(r)(5)(C), although we acknowledge that there may be some overlap between those standards and the standards related to qualifications for duty of care and breach.

the plaintiff) (citing *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996));

*Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 762–63 (Tex.

App.—Houston [14th Dist.] 2007, no pet.) (deciding that a doctor was qualified

to opine about causation because his report demonstrated direct experience

with treating decubitus ulcers, which was the condition at issue).  In other

words,

> there is no validity, if there ever was, to the notion that every
> licensed medical doctor should be automatically qualified to testify
> as an expert on every medical question. . . .  [T]he proponent of
> the testimony has the burden to show that the expert 'possesses
> special knowledge as to the very matter on which he proposes to
> give an opinion.'

*Ehrlich*, 144 S.W.3d at 625 (quoting *Broders*, 924 S.W.2d at 152–53).

"A medical expert who is not of the same school of medicine, however, is

competent to testify if he has practical knowledge of what is usually and

customarily done by a practitioner under circumstances similar to those

confronting the defendant."  *Id.*

Dr. Foster argues that Dr. Drazner is not qualified as an expert on

causation in this case because although Dr. Foster is an orthopedic surgeon,

Dr. Drazner "is an internist who specializes in Physical Medicine and

Rehabilitation" and has not demonstrated "that he has had education or

experience in the diagnosis, care, or treatment of an orthopedic surgery

22

patient." Dr. Foster relies on *Ehrlich* and *Collini*. In *Ehrlich*, we held that a neurologist, although skilled in the treatment of issues related to the nervous system, was not qualified to submit an expert report on the validity of surgical procedures used during the plaintiff's face lift and implants. *Id.* at 625–26. In *Collini*, we concluded that a doctor was not qualified to submit a report about whether the prolonged prescription of a drug caused the plaintiff's condition because the doctor did not show that he had any knowledge, experience, education, or training on that causal relationship or about the specific drug or condition involved in the case. *Collini*, 280 S.W.3d at 465–66.

This case is different from *Ehrlich* and *Collini* because Dr. Drazner has shown experience with the exact issue involved in Richardson's claim against Dr. Foster. Dr. Drazner's report assigns blame to Dr. Foster for failing to follow orthopedic diagnostic procedures (such as failing to complete a range of motion test and failing to document hallmarks of the complex regional pain syndrome) that would have allowed him to correctly diagnose Richardson's broken ankle and thus avoid (among other results) the continued pain associated with an incorrect diagnosis; it does not assess blame on Dr. Foster for processes involved with an orthopedic surgery.

Rather, our case is more akin to *Barber v. Mercer*, where we determined that an anesthesiologist was qualified to give an expert report on a surgeon

during orthopedic surgery regarding the proper positioning and padding of the patient. No. 02-08-00079-CV, 2009 WL 3337192, at *8 (Tex. App.—Fort Worth Oct. 15, 2009, no pet.). Dr. Drazner's report and curriculum vitae establish his qualifications to submit a report about orthopedic diagnostic procedures; they show that he obtained his medical degree in 1986 and that at the time he submitted his report, he had practiced medicine in Texas for eighteen years with a specialty in physical medicine and rehabilitation and a secondary specialty in occupational medicine. He primarily treats patients who have suffered orthopedic injuries, and he has "treated approximately 20,000 patients with [orthopedic] injuries and performed several hundred thousand [orthopedic] examinations." Since 1995, he has practiced in the area of "Physical Medicine and Rehabilitation, Pain Management."

Dr. Drazner has served as a featured speaker on several topics, including one on "Multidisciplinary Approaches to the Management of Complex Regional Pain Syndrome," which is the particular condition that Dr. Foster diagnosed Richardson as having. Dr. Drazner has also lectured on the management of knee injuries.

Therefore, we hold that the trial court did not abuse its discretion by denying Dr. Foster's motion to dismiss on the basis that Dr. Drazner is not

24

qualified to provide an opinion on the causal relationship between Dr. Foster's actions and Richardson's harm. *See Palacios*, 46 S.W.3d at 875.[11]

---

[11] Dr. Foster contends that Dr. Drazner was required to establish that he is qualified to provide an opinion on the length of time it takes a bone to set so that he could show that Richardson's ankle fracture worsened between Dr. Foster's diagnosis and the later diagnosis of Richardson's broken ankle. Because we have already sustained Dr. Foster's issue about the expert report's adequacy to establish a causal relationship between Dr. Foster's actions and Richardson's ankle treatment, we will not address Dr. Drazner's qualifications to provide an opinion on that same issue. *See* Tex. R. App. P. 47.1.

Conclusion

Having overruled the majority of Dr. Foster's sole issue regarding Richardson's assertion that his alleged misdiagnosis caused her additional pain, we affirm the trial court's order denying his motion to dismiss as to that issue. Having sustained a portion of Dr. Foster's sole issue concerning Richardson's assertion that his alleged misdiagnosis caused her need for ankle surgeries and having found Dr. Drazner's report deficient as to that causal relationship, we reverse the trial court's decision regarding the sufficiency of the report in that regard and remand this case to that court to consider the issue of whether to grant Richardson a thirty-day extension to cure that deficiency. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Leland*, 257 S.W.3d at 207; *Collini*, 280 S.W.3d at 468.

TERRIE LIVINGSTON
JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

CAYCE, C.J. not participating.

DELIVERED:  December 31, 2009

26