COURT OF APPEALS

                                                 SECOND DISTRICT
OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-379-CV

 

 

DOROTHY
MENEFEE, INDIVIDUALLY                                           APPELLANTS

AND
AS NEXT OF FRIEND OF 

EVOLLA TUTT, AND EVOLLA TUTT                                                                     

 

                                                             V.

 

ALLAN B. OHMAN, JR.,
M.D.                                                                APPELLEE

 

                                                       ------------

 

               FROM
THE 67TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------








This
case involves health care liability claims against numerous defendants arising
out of the diagnosis and treatment of appellant Evolla Tutt. In a single issue,
appellants Tutt and her mother, Dorothy Menefee, contend that the trial court
abused its discretion by granting appellee Allan B. Ohman, Jr., M.D.=s
motion to dismiss their claims against him for failure to file an adequate
expert report.  See Tex. Civ.
Prac. & Rem. Code Ann. '
74.351(b) (Vernon Supp. 2009).  Because
we hold that the trial court abused its discretion by determining that
appellants=
expert is not qualified to opine as to the standard of care applicable to Dr.
Ohman and by also concluding that the expert report is inadequate, we reverse
and remand.

                                                Background
Facts

Appellants
sued Dr. Ohman and numerous others on February 24, 2009. Appellants alleged
that on February 25, 2007, when Tutt was sixteen, she was admitted to Millwood
Hospital and diagnosed with Amajor
depressive disorder with psychosis.@  While at Millwood, she was given Aseveral
psychiatric medications, including Seroquel, Concerta, Zoloft and Haldol, as
well as Benadryl and Ativan.@  After becoming Aacutely
confused@ and
falling in her room, Tutt was transported to Arlington Memorial Hospital.  While at Arlington Memorial, Menefee told the
staff that her daughter had changed significantly while at MillwoodCwhen
she left Tutt there she was Aalert,
verbal and independent@Cbut
at Arlington Memorial she was Anot
making eye contact . . . drooling . . . non-verbal. . . breathing . .
. but . . . not communicating.  Her whole
body [was] shaking (Not seizure-like violently shaking, but all over trembling
to the point of vibrating the wheelchair.).@  Because Menefee thought her daughter=s
condition was deteriorating while waiting at Arlington Memorial, she drove her
daughter to North Hills Hospital that same day.








Appellants
allege that three doctors saw Tutt on March 1, 2007 at North Hills and that Dr.
Ohman examined her on March 2, noting, AI am
not aware of any pediatric syndrome that would explain this situation.  I guess that she is reacting to her
medications that were given to her and that she will probably continue to be in
this state until the medications wear off.@  While at North Hills, Tutt suffered seizures
and was placed on a ventilator. 
Appellants allege that she suffered Asubstantial
brain damage and permanent, debilitating physical and mental impairment that
she continues to suffer in the present.@

As
to Dr. Ohman, appellants alleged that he owed Tutt Ain
an acute care setting the duty of immediate and sufficient medical response to
her condition in order to prevent brain damage.@  They further alleged that he Abreached
his standard of care by failing to immediately prescribe prophylactic
anticonvulsants in sufficient dosages to prevent further seizures, given the
history of the patient upon admission.@

Appellants
timely served an expert report from Dr. J. Boswell Tabler, Jr. on Dr. Ohman,
who filed combined objections to the sufficiency of the report and a motion to
dismiss.  See id.  Dr. Ohman objected to Dr. Tabler=s
qualifications to provide an opinion claiming that Dr. Tabler, a psychiatrist,
did not explain how he has knowledge of the applicable standards of care as to
Dr. Ohman, a consulting pediatrician. 
Dr. Ohman also objected that Dr. Tabler failed to set forth the standard
of care applicable to a pediatrician. 
Dr. Ohman further objected that Dr. Tabler=s
causation statements are conclusory.  The
trial court sustained Dr. Ohman=s
objections, granted the motion to dismiss, and dismissed the claims against Dr.
Ohman with prejudice.[1]








                                               Standard
of Review

A
trial court=s
decision on a motion to dismiss under section 74.351 is subject to an abuse of
discretion standard.  See, e.g., Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex.
2001); Craig v. Dearbonne, 259 S.W.3d 308, 310 (Tex. App.CBeaumont
2008, no pet.); San Jacinto Methodist Hosp. v. Bennett, 256 S.W.3d 806,
811 (Tex. App.CHouston
[14th Dist.] 2008, no pet.); Lal v. Harris Methodist Fort Worth, 230
S.W.3d 468, 471 (Tex. App.CFort
Worth 2007, no pet.).  Additionally, a
trial court=s
decision on whether a physician is qualified to offer an expert opinion in a
health care liability claim is reviewed under an abuse of discretion
standard.  See Mem=l
Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex.
App.CHouston
[14th Dist.] 2007, no pet.).

To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241B 42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986).  Merely
because a trial court may decide a matter within its discretion in a different
manner than an appellate court would in a similar circumstance does not
demonstrate that an abuse of discretion has occurred.  Id. at 242.  A trial court does not abuse its discretion
if it commits a mere error in judgment.  See
E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex.
1995).








                                        Expert
Report Requirements

In a
health care liability claim, a claimant must serve on each defendant an expert
report that addresses standard of care, liability, and causation no later than
the 120th day after the claim is filed. 
Tex. Civ. Prac. & Rem. Code Ann. '
74.351(a), (j); Barber v. Mercer, 303 S.W.3d 786, 790  (Tex. App.CFort
Worth 2009, no pet.).  If an expert
report has not been served on a defendant within the 120‑day period, then
on the motion of the affected defendant, the trial court must dismiss the claim
with prejudice and award the defendant reasonable attorney=s
fees and costs.  Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351(b); Barber,
303 S.W.3d at 790.  A report Ahas
not been served@ under the statute when it
has been physically served but it is found deficient by the trial court.  Lewis v. Funderburk, 253 S.W.3d 204,
207B08
(Tex. 2008); Barber, 303 S.W.3d at 790B91.  When no report has been served because the
report that was served was found to be deficient, the trial court has
discretion to grant one thirty-day extension to allow the claimant the
opportunity to cure the deficiency.  Tex.
Civ. Prac. & Rem. Code Ann. '
74.351(c); Barber, 303 S.W.3d at 791.








A
report is deficient (therefore subjecting a claim to dismissal) when it Adoes
not represent an objective good faith effort to comply with the definition of
an expert report@ in the statute.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(l);
Barber, 303 S.W.3d at 791.  While
the expert report Aneed not marshal all the
plaintiff=s
proof,@ Palacios,
46 S.W.3d at 878, it must provide a fair summary of the expert=s
opinions as to the Aapplicable standards of
care, the manner in which the care rendered by the physician or health care
provider failed to meet the standards, and the causal relationship between that
failure and the injury, harm, or damages claimed.@  Tex. Civ. Prac. & Rem. Code Ann. '
74.351(r)(6); Barber, 303 S.W.3d at 791.

To
qualify as a good faith effort, the report must Adiscuss
the standard of care, breach, and causation with sufficient specificity to
inform the defendant of the conduct the plaintiff has called into question and
to provide a basis for the trial court to conclude that the claims have merit.@  Palacios, 46 S.W.3d at 875; Barber,
303 S.W.3d at 791.  A report does not
fulfill this requirement if it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Palacios, 46 S.W.3d at 879; Barber,
303 S.W.3d at 791.  The information in
the report Adoes
not have to meet the same requirements as the evidence offered in a summary‑judgment
proceeding or at trial.@  Palacios, 46 S.W.3d at 879; Barber,
303 S.W.3d at 791.  When reviewing the
adequacy of a report, the only information relevant to the inquiry is the
information contained within the four corners of the document alone. Palacios,
46 S.W.3d at 878; Barber, 303 S.W.3d at 791; see Bowie Mem=l
Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002).  This requirement precludes a court from
filling gaps in a report by drawing inferences or guessing as to what the
expert likely meant or intended.  Barber,
303 S.W.3d at 791; see Austin Heart, P.A. v. Webb, 228 S.W.3d 276, 279
(Tex. App.CAustin
2007, no pet.) (citing Bowie Mem=l
Hosp., 79 S.W.3d at 53).








                                     Qualifications
of Expert Witness

Appellants
contend that Dr. Tabler, a psychiatrist, is qualified to opine as an expert
regarding the standard of care applicable to Dr. Ohman, a pediatrician
consulting in the emergency room.

To
be an Aexpert@ on
the departure from a physician=s
standard of care, a person must be a physician who

(1)
is practicing medicine at the time such testimony is given or was practicing
medicine at the time the claim arose;

 

(2)
has knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim; and

 

(3)
is qualified on the basis of training or experience to offer an expert opinion
regarding those accepted standards of medical care.

 

Tex. Civ. Prac. & Rem.
Code Ann. '
74.351(r)(5)(A), ' 74.401(a) (Vernon
2005).  In determining whether a
physician is qualified on the basis of training or experience, courts must
consider whether the physician who completed the report (1) is board certified
or has other substantial training or experience in an area of medical practice
relevant to the claim, and (2) is actively practicing medicine in rendering
medical care services relevant to the claim. Id. ' 74.401(c).  In other words,

there
is no validity, if there ever was, to the notion that every licensed medical
doctor should be automatically qualified to testify as an expert on every
medical question. . . .  [T]he proponent
of the testimony has the burden to show that the expert possesses special
knowledge as to the very matter on which he proposes to give an opinion.

 








Ehrlich v. Miles, 144
S.W.3d 620, 625 (Tex. App.CFort
Worth 2004, pet. denied) (quoting Broders v. Heise, 924 S.W.2d 148, 152B53
(Tex. 1996)); see Barber, 303 S.W.3d at 791B92.  For this reason, the offered report (along
with the physician=s curriculum vitae) must
generally demonstrate that the expert has Aknowledge,
skill, experience, training, or education regarding the specific issue before
the court which would qualify the expert to give an opinion on that particular
subject.@  Ehrlich, 144 S.W.3d at 625 (quoting Roberts
v. Williamson, 111 S.W.3d 113, 121 (Tex. 2003)); see Tex. R. Evid.
702; Barber, 303 S.W.3d at 792.

However,
Athere
are certain standards of medical care that apply to multiple schools of
practice and any medical doctor.@  Blan v. Ali, 7 S.W.3d 741, 746 (Tex.
App.CHouston
[14th Dist.] 1999, no pet.).  If the
subject matter is common to and equally recognized and developed in all fields
of practice, any physician familiar with the subject may testify as to the
standard of care.  Broders, 924
S.W.2d at 152; Barber, 303 S.W.3d at 72 (holding that anesthesiologist
who had participated in hundreds of cardiothoracic surgeries could testify to
proper padding and positioning techniques for which a general surgeon should
have knowledge).  Therefore, a physician Awho
is not of the same school of medicine [as the defendant]
. . . is competent to testify if he has practical knowledge of
what is usually and customarily done by a practitioner under circumstances
similar to those confronting the defendant.@ Ehrlich,
144 S.W.3d at 625; see also Marling v. Maillard, 826 S.W.2d 735, 740
(Tex. App.CHouston
[14th  Dist.] 1992, no writ).








The
proper inquiry concerning whether a doctor is qualified to testify is not his
or her area of practice but rather the doctor=s
familiarity with the issues involved in the claim before the court.  Foster v. Richardson, 303 S.W.3d 833,
843 (Tex. App.CFort
Worth 2009, no pet.) (holding that internist specializing in physical medicine
and rehabilitation could provide expert report against orthopedist in case
involving delayed diagnosis of ankle injury and resulting prolonged pain); Blan,
7 S.W.3d at 745 (holding that neurologist could provide expert report against
cardiologist and emergency room doctors indicating that the standard of care
for treating a stroke patient is the same for all doctors).

                                               Dr.
Tabler=s
Report








Dr.
Tabler is a board-certified psychiatrist who at the time of authoring his
report had been practicing almost twenty-four years, twenty of those years in
private practice.  At the time he
authored the report, he was the Medical Director of the Behavioral/Medicine
Unit of Kindred Hospital, Medical Director of IOP Senior Perspectives, Medical
Director of the Gero-Psychiatric Unit of Ten Broeck Hospital, and a consultant
to the Pathways Brain Injury Unit, Christopher East Healthcare Center in
Louisville, Kentucky.  His primary
practice area was in psychopharmacology. 
He had previously served as the medical director of a different hospital=s
behavioral health unit and as medical director of Ten Broeck Hospital=s
acute unit; he had also worked as a consultant for several different health
care programs, as an attending physician at the Kentucky Correctional Center,
and as a clinical faculty member at the University of Louisville psychiatry
department.

Dr.
Tabler concluded that the negligence of all the physicians and staff who saw
Tutt at Millwood, Arlington Memorial, and North Hills Awas
a proximate cause of [her] injuries and permanent brain damage.@  He noted that Dr. Ohman saw Tutt for a Apediatric
internal medicine consultation@
while she was at North Hills.  The
pertinent parts of Dr. Tabler=s
report follow.

Dr.
Tabler stated that when Tutt was admitted to Millwood, doctors diagnosed her
with Amajor
depressive disorder with psychosis.@  Her prescriptions for Concerta, Seroquel, and
Zoloft were continued at the hospital, and doctors additionally prescribed her
Haldol, Ativan, and Benadryl.  On Tutt=s
second day at Millwood, she had a temperature of 100.2, was lethargic during
group therapy, and appeared to fall asleep at times during therapy.  Two days later, she became Aacutely
confused@ and
fell, suffering soft tissue damage on her face and head, and precipitating her
transport to Arlington Memorial.[2]








After
Tutt=s
mother, Menefee, moved her from Arlington Memorial to North Hills, the staff at
North Hills noted that Tutt was Afeverish
with an unstable blood pressure.@  One of the doctors who initially saw herCwhen
she was running a fever of 102Cassessed
Tutt as having an A[a]ltered [m]ental [s]tatus
. . . , likely cause may be secondary to her psychiatric medications side
effects like Neuroleptic Malignant Syndrome.@  The doctor recommended monitoring Tutt in the
emergency room.

Dr.
Tabler notes the following about Dr. Ohman=s
examination of Tutt:

On March 2, 2007 [Tutt=s second day at North
Hills] at 11:59 a.m., the patient had a pediatric internal medicine consultation
by [Dr. Ohman].  After receiving a
history of a fall at Millwood following administration of medications,
including Haldol and Benadryl.  [sic]  He states that Aduring the fall, she
was also found to have been incontinent and had an episode of emesis
[vomiting].  Since that point she has
been unresponsive to painful stimuli.@  Dr.
Ohman further noted that the patient was Adrooling@ and Awill not speak.@  His impression was:  AWe have a 16 yr. old girl with mental status
changes following medication adjustments over at Millwood.  The patient has had a negative
electroencephalogram which makes seizure and postictal state unlikely.  She has had a lumbar puncture and multiple
cultures are pending.  She is also on a
great deal of antibiotics as we await those cultures.  I am not aware of any pediatric syndrome that
would explain this situation.  I
guess that she is reacting to her medications that were given to her and that
she will probably continue to be in this state until the medications wear off.@  Dr. Ohman=s plan at this time was stated as
follows:  AI have gone ahead and
ordered four point restraints for her since she is not responding to commands
and she was getting out of bed.  I agree
with all the tests that have already been ordered.  I am going to look to see if maybe a sed rate
and ANA have been done just to make sure that we have not missed some sort of
unusual autoimmune disease presentation. 
However, I think our best bet is to go ahead and support her and
give a chance for the medications to wear out of her system.@

 

Dr. Tabler concluded his
review of the facts as follows:








Evolla
Tutt suffered a major catastrophic neurologic event(s) from which she has never
recovered.  She now requires complete
around-the-clock care.  During her stay
at Millwood and directly related to her care at Millwood, the chain of event
was initiated. This negligent chain of events continued at AMH and NHH and
eventually left her with a permanently altered mental state, bowel and urinary
incontinence, nystagmus, and spastic paralysis. 
The negligence by the physicians and staff at all three hospitals . .
. as detailed herein was a proximate cause of Evolla=s
injuries and permanent brain damage.  [Emphasis added.]        

Under
the heading, Familiarity With The Standard of Care, Dr. Tabler opined,

As a board-certified psychiatrist, I am
consulted by others to evaluate patients and to make treatment recommendations
for similar cases as Evolla Tutt.  I
have knowledge of the accepted standard of care for the diagnosis, care and
treatment of the illness, injury or conditions, and am qualified based on
training and experience to offer the standard of care expert opinions expressed
herein.  I am familiar with the standard
of care of a reasonable and prudent physician for evaluation and treatment of
major depressive disorder with psychotic features, schitzo-affective disorder
and/or schizophrenia.

 

I am practicing medicine at the time this
expert report was drafted and was at the time the patient=s injury occurred in
the fields of psychiatry and neuropharmacology. 
From September 2006 to the present, I have served as the medical
director of the Behavioral/Medicine Unit of Kindred Hospital in Louisville,
Kentucky, managing the treatment of a broad range of psychiatric emergencies
and disorders, and working closely with other disciplines providing emergent,
intensive and long-term care to our patients. . . .

 

By way of my education, training, independent
research and professional experience, I have knowledge of the accepted
standards of care for the diagnosis, care and treatment of medical emergencies
arising in patients during the treatment of inpatient/acute psychiatric
disorders, as in this particular case. . . .

 








During the course of my practice in the field
of psychiatry and neuropharmacology, I work closely with physicians practicing
in the fields of internal medicine, neurology, toxicology, emergency
medical care, pharmacology and pulmonary medicine, as well as registered
nurses, licensed professional counselors and physicians= assistants working
under my supervision.  The effects of
the various psychoactive substances routinely utilized to treat psychiatric
disorders implicate all of these disciplines due to the great importance of
balancing the associated risks of psychiatric medicines with the purported
benefits.  In the course of caring for
patients, I have therefore developed expertise in these related disciplines in
order to effectively recognize and appropriately treat adverse reactions to
medications and other medical complications when and if they arise.

 

My training and publications in psychiatry,
psychotropic medications, depression, seizure, brain injury, neuropharmacology
and related fields allow appropriate background and experience to express an
opinion on the causes relating to the multiple standards of care in this
case.  Standards of care in this case
cross practice areas C there are many
aspects of medical treatment that cross practice specialty areas and in such
situations, the appropriate standard of care will be the same for most
providers regardless of their specialties. . . . [Emphasis added.]

 

After
explaining his familiarity with the standard of care, Dr. Tabler explained the
relevant conditions at issue.  According
to Dr. Tabler, these are

$        Neuroleptic
malignant syndrome:  This is a
potentially-fatal brain and bodily disorder with sequelae requiring active
medication treatment if suspected to prevent complications.  The classic triad involves the autonomic
nervous system (fever in 100%), the extrapyramidal system (rigidity) (tremor),
and cognitive changes. . . .

 

$        Epileptic
Seizure:  An epileptic seizure is
a transient symptom of abnormal, excessive or synchronous neuronal activity in
the brain.  It can manifest as an
alteration in mental state, tonic or clonic movements, convulsions, and various
other psychic symptoms.  The medical
syndrome of recurrent, unprovoked seizures is termed epilepsy, but seizures can
occur in people who do not have epilepsy.

 

$        Status
epilepticus:  This refers to a
life-threatening condition in which the brain is in a state of persistent
seizure that will not stop without intervention.

 

Dr.
Tabler set forth a lengthy standard of care paragraph applicable to all
physicians at North Hills, as well as a shorter paragraph specific to each
physician.  The general paragraph reads
as follows:








Evolla
Tutt presented upon admission at North Hills Hospital as a patient with
suspected seizure activity who had recently been administered both atypical and
first generation antipsychotics, both of which are known to reduce the patient=s seizure threshold.  Due to the patient=s elevated
temperature, reported history from her mother and possibly other sources,
recent drug regimen and non-responsiveness, Neuroleptic Malignant Syndrome
(NMS), central nervous system infection including possible pathogen-induced
encephalitis, serotonin syndrome, catatonic schizophrenia, thyreotoxic crisis
and possibly acute neuroleptic intoxication would properly have been considered
possible explanations for her health condition in a differential
diagnosis.  Irrespective of the ultimate
cause of the patient=s condition, the
standard of care required North Hills Hospital and the medical care providers
treating Ms. Tutt at that facility to immediately come to the conclusion that
the risk for the patient of continued seizure activity far outweighed any risks
associated with the administration of prophylactic anticonvulsants.  North Hills Hospital=s failure to
adequately buffer Ms. Tutt=s defenses against seizure in this instance
and abate her rapidly deteriorating health status post-Millwood and Arlington
Memorial=s substandard
treatment caused the patient to suffer many more seizures, which to a
reasonable degree of medical probability were a producing cause of the
substantial brain damage that has permanently disabled her. . . .

 

As
to the specific alleged standard of care applicable to Dr. Ohman, Dr. Tabler
opined,

Dr. Ohman began treating the patient on March
2 at North Hills Hospital at 9:51 A.M. in his capacity as a consulting
pediatrician.  Dr. Ohman failed the
patient while she was under his care at the North Hills Hospital facility,
contributing to Ms. Tutt=s injuries.  Dr. Ohman owed the patient in an acute care
setting the duty of immediate and sufficient medical response to her condition
in order to prevent brain damage.  The patient
was admitted with suspicion of recent seizure activity and Neuroleptic
Malignant Syndrome (NMS) following recent increases in her antipsychotic
medications at Millwood Hospital, per the history provided by the patient=s mother.  Dr. Ohman notes the following:

 








[Here,
Dr. Tabler recites Dr. Ohman=s notes indicating
his knowledge of her history of medications, subsequent confusion and fall, and
her condition at Arlington Memorial, as well as the results of his
examination.]

 

Dr.
Ohman breached his standard of care by failing to immediately prescribe
prophylactic anticonvulsants in sufficient dosages to prevent further seizures,
given the history of the patient upon admission.  To a reasonable degree of medical
probability, this failure by Dr. Ohman to intervene at this early point in the
patient=s
treatment at North Hills Hospital contributed to her continued seizures and
ultimate brain damage.  [Emphasis added.]

                        Dr. Tabler Is
Qualified To Render Expert Report

Dr.
Ohman contends that Dr. Tabler=s
report is deficient because Dr. Tabler does not indicate that he has ever
participated in the provision of pediatric care to a patient such as Tutt.  Specifically, Dr. Ohman contends that his Alimited
pediatric consulting role in this case require[s] that the allegations raised
against him be substantiated by an expert who has the qualifications to opine
on the treatment provided in that limited role.@  He contends that Dr. Tabler does not indicate
that he has ever worked with a pediatrician, has practical knowledge of what is
customarily or usually done by a pediatrician under similar circumstances, or
has any experience treating patients like Tutt.








A
pediatrician is a specialist in Athe
study and treatment of children in health and disease during development
from birth to adolescence.@  Stedman=s
Medical Dictionary 1446 (28th ed. 2006) (emphasis added).  Reading Dr. Tabler=s
report as a whole, he clearly indicates that he has experience evaluating and
making treatment recommendations for patients Ain
similar cases as@ Tutt=s
and that his knowledge of the standard of care applies to the emergency
treatment of psychiatric patients Aas
in this particular case.@  See Barber, 303 S.W.3d at 794 (holding
that court must not view any one part of expert report or curriculum vitae in
isolation).   He does not limit this
experience and knowledge to a particular age group but to the underlying
condition at issue.








Although
Dr. Ohman characterizes treatment of Tutt=s
condition as the provision of pediatric services to Tutt, it is more properly
characterized as the evaluation and treatment of a pediatric patient, with an
underlying diagnosis of major depressive disorder and psychosis, presenting in
an emergency room setting with suspicion of recent seizure activity and
neuroleptic malignancy syndrome.  Dr.
Tabler=s
training and experienceCincluding his work in both
psychiatric and acute care settingsCshow
that he is qualified to render an expert opinion as to the treatment of such a
condition.  See Foster, 303
S.W.3d at 843; Blan, 7 S.W.3d at 745B47; see
also Barber, 303 S.W.3d at 794B96
(concluding that entirety of expert report showed that anesthesiologist was
qualified to render expert opinion against general surgeon because report
showed anesthesiologist=s experience with the type
of surgery at issue even though report never stated that anesthesiologist had
experience working specifically with general surgeons).  And although Dr. Tabler does not specifically
mention working with pediatricians in his report, he does state that he has
worked specifically with internal medicine specialists and emergency room
doctors and that the standard of care for treatment of conditions similar to
Tutt=s
crosses practice specialties; moreover, he notes in his report that Dr. Ohman
performed a pediatric internal medicine evaluation of Tutt in the
emergency room.  Accordingly, we conclude
and hold that, reading Dr. Tabler=s
report in its entirety, he is qualified to render an expert opinion as to the
standard of care applicable to Dr. Ohman=s
treatment of Tutt=s condition in this case
and, therefore, that the trial court abused its discretion by determining
otherwise.

       Articulation of Standard of Care And
Breach Are Sufficiently Specific

In
his objections to Dr. Tabler=s
report, Dr. Ohman also claimed that Dr. Tabler failed to specifically set forth
the standard of care applicable to Dr. Ohman as a pediatrician and how Dr.
Ohman breached such a standard.  See
Bowie Mem=l Hosp.,
79 S.W.3d at 52B53; Rusk v. Titus Hosp.
Dist., 128 S.W.3d 332, 340 (Tex. App.CTexarkana
2004, pet. denied).  But as set forth
above, Dr. Tabler not only set forth a standard of care applicable to all of
the physicians at North Hills, he also later specifically described that
standard in reference to Dr. Ohman=s
care of Tutt.  He also specifically
described how Dr. Ohman allegedly breached that standard of care:  by failing to immediately prescribe
anticonvulsants for Tutt instead of waiting for the other medications to Awear
out of her system.@  Accordingly, we conclude and hold that the
trial court abused its discretion by sustaining this objection to Dr. Tabler=s
report. See Davisson v. Nicholson, No. 02-09-00169-CV, 2010 WL 1137031,
at *9B10
(Tex. App.CFort
Worth Mar. 25, 2010, no pet.) (op. on reh=g); Foster,
303 S.W.3d at 843.








                                    Sufficiency
of Causation Opinion

Dr.
Ohman=s
final objection to Dr. Tabler=s
report is that its statements regarding causation are conclusory.  See Bowie Mem=l
Hosp.,
79 S.W.3d at 53. According to Dr. Ohman, this court must engage in
impermissible gap-filling to determine how Dr. Ohman=s
alleged breach of the described standard of care caused Tutt=s
injuries.  Dr. Tabler faults Dr. Ohman
for one thing:  failing to immediately
prescribe anticonvulsant medication to Tutt to stop her seizures. He states
earlier in his report that because all of the doctors continually failed to
prescribe such anticonvulsant therapy after recognizing the seizure activity,
Tutt continued to have seizures as a result of the syndrome caused by the
medications she had been given at Millwood, and that the continuation of those
seizures caused her resulting brain damage. 
In other words, Dr. Tabler=s
report indicates that each doctor failed to prescribe the anticonvulsants, that
each failure contributed to more seizures, and that the multiple seizures
caused the injury.  Therefore, we
conclude and hold that this statement of causation is sufficiently specific and
not conclusory and that the trial court abused its discretion by granting this
objection to Dr. Tabler=s report.  See Granbury Minor Emergency Clinic v.
Thiel, 296 S.W.3d 261, 273 (Tex. App.CFort
Worth 2009, no pet.); Apodaca v. Miller, 281 S.W.3d 123, 128B29
(Tex. App.CEl
Paso 2008, no pet.); Chandler v. Singh, 129 S.W.3d 184, 191B92
(Tex. App.CTexarkana
2004, no pet.).








Having
determined that the trial court abused its discretion by granting Dr. Ohman=s
objections to Dr. Tabler=s report, we conclude and
hold that the trial court likewise abused its discretion by dismissing
appellants=
claims against Dr. Ohman.  We sustain
appellants=
sole issue.

                                                     Conclusion

Having
sustained appellants= sole issue, we reverse the
trial court=s
order and remand this case to the trial court for further proceedings on
appellants=
claims against Dr. Ohman.

 

 

TERRIE LIVINGSTON

CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

 

DELIVERED:  May 27, 2010











[1]Although appellants
had requested a thirty-day extension of time to file an amended report, the
trial court denied this request.





[2]The doctors at
Millwood discontinued the Seroquel and started Tutt on Abilify.