# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH



### NO. 2-09-379-CV

DOROTHY MENEFEE, INDIVIDUALLY                                APPELLANTS
AND AS NEXT OF FRIEND OF
EVOLLA TUTT, AND EVOLLA TUTT

V.

ALLAN B. OHMAN, JR., M.D.                                       APPELLEE

------------

### FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

This case involves health care liability claims against numerous defendants arising out of the diagnosis and treatment of appellant Evolla Tutt. In a single issue, appellants Tutt and her mother, Dorothy Menefee, contend that the trial court abused its discretion by granting appellee Allan B. Ohman, Jr., M.D.'s motion to dismiss their claims against him for failure to file an adequate expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) (Vernon Supp. 2009). Because we hold that the trial court abused its discretion by determining that appellants' expert is not qualified to

opine as to the standard of care applicable to Dr. Ohman and by also concluding that the expert report is inadequate, we reverse and remand.

## Background Facts

Appellants sued Dr. Ohman and numerous others on February 24, 2009. Appellants alleged that on February 25, 2007, when Tutt was sixteen, she was admitted to Millwood Hospital and diagnosed with "major depressive disorder with psychosis." While at Millwood, she was given "several psychiatric medications, including Seroquel, Concerta, Zoloft and Haldol, as well as Benadryl and Ativan." After becoming "acutely confused" and falling in her room, Tutt was transported to Arlington Memorial Hospital. While at Arlington Memorial, Menefee told the staff that her daughter had changed significantly while at Millwood—when she left Tutt there she was "alert, verbal and independent"—but at Arlington Memorial she was "not making eye contact . . . drooling . . . non-verbal. . . breathing . . . but . . . not communicating. Her whole body [was] shaking (Not seizure-like violently shaking, but all over trembling to the point of vibrating the wheelchair.)." Because Menefee thought her daughter's condition was deteriorating while waiting at Arlington Memorial, she drove her daughter to North Hills Hospital that same day.

Appellants allege that three doctors saw Tutt on March 1, 2007 at North Hills and that Dr. Ohman examined her on March 2, noting, "I am not aware of any pediatric syndrome that would explain this situation. I guess that she is reacting to her medications that were given to her and that she will probably continue to be in

2

this state until the medications wear off." While at North Hills, Tutt suffered seizures and was placed on a ventilator. Appellants allege that she suffered "substantial brain damage and permanent, debilitating physical and mental impairment that she continues to suffer in the present."

As to Dr. Ohman, appellants alleged that he owed Tutt "in an acute care setting the duty of immediate and sufficient medical response to her condition in order to prevent brain damage." They further alleged that he "breached his standard of care by failing to immediately prescribe prophylactic anticonvulsants in sufficient dosages to prevent further seizures, given the history of the patient upon admission."

Appellants timely served an expert report from Dr. J. Boswell Tabler, Jr. on Dr. Ohman, who filed combined objections to the sufficiency of the report and a motion to dismiss. *See id*. Dr. Ohman objected to Dr. Tabler's qualifications to provide an opinion claiming that Dr. Tabler, a psychiatrist, did not explain how he has knowledge of the applicable standards of care as to Dr. Ohman, a consulting pediatrician. Dr. Ohman also objected that Dr. Tabler failed to set forth the standard of care applicable to a pediatrician. Dr. Ohman further objected that Dr. Tabler's causation statements are conclusory. The trial court sustained Dr. Ohman's objections, granted the motion to dismiss, and dismissed the claims against Dr. Ohman with prejudice.[1]

---

[1] Although appellants had requested a thirty-day extension of time to file an amended report, the trial court denied this request.

**Standard of Review**

A trial court's decision on a motion to dismiss under section 74.351 is subject to an abuse of discretion standard. *See, e.g., Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Craig v. Dearbonne*, 259 S.W.3d 308, 310 (Tex. App.—Beaumont 2008, no pet.); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Lal v. Harris Methodist Fort Worth*, 230 S.W.3d 468, 471 (Tex. App.—Fort Worth 2007, no pet.). Additionally, a trial court's decision on whether a physician is qualified to offer an expert opinion in a health care liability claim is reviewed under an abuse of discretion standard. *See Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id*. at 242. A trial court does not abuse its discretion if it commits a mere error in judgment. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

4

**Expert Report Requirements**

In a health care liability claim, a claimant must serve on each defendant an expert report that addresses standard of care, liability, and causation no later than the 120th day after the claim is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j); *Barber v. Mercer*, 303 S.W.3d 786, 790 (Tex. App.—Fort Worth 2009, no pet.). If an expert report has not been served on a defendant within the 120-day period, then on the motion of the affected defendant, the trial court must dismiss the claim with prejudice and award the defendant reasonable attorney's fees and costs. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Barber*, 303 S.W.3d at 790. A report "has not been served" under the statute when it has been physically served but it is found deficient by the trial court. *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008); *Barber*, 303 S.W.3d at 790–91. When no report has been served because the report that was served was found to be deficient, the trial court has discretion to grant one thirty-day extension to allow the claimant the opportunity to cure the deficiency. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Barber*, 303 S.W.3d at 791.

A report is deficient (therefore subjecting a claim to dismissal) when it "does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*); *Barber*, 303 S.W.3d at 791. While the expert report "need not marshal all the plaintiff's proof," *Palacios*, 46 S.W.3d at 878, it must provide a fair summary of the expert's opinions

as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Barber*, 303 S.W.3d at 791.

To qualify as a good faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875; *Barber*, 303 S.W.3d at 791. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Palacios*, 46 S.W.3d at 879; *Barber*, 303 S.W.3d at 791. The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879; *Barber*, 303 S.W.3d at 791. When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document alone. *Palacios*, 46 S.W.3d at 878; *Barber*, 303 S.W.3d at 791; *see Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Barber*, 303 S.W.3d at 791; *see Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 53).

6

**Qualifications of Expert Witness**

Appellants contend that Dr. Tabler, a psychiatrist, is qualified to opine as an expert regarding the standard of care applicable to Dr. Ohman, a pediatrician consulting in the emergency room.

To be an "expert" on the departure from a physician's standard of care, a person must be a physician who

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A), § 74.401(a) (Vernon 2005). In determining whether a physician is qualified on the basis of training or experience, courts must consider whether the physician who completed the report (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim, and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id*. § 74.401(c). In other words,

> there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. . . . [T]he proponent of the testimony has the burden to show that the expert possesses special knowledge as to the very matter on which he proposes to give an opinion.

*Ehrlich v. Miles*, 144 S.W.3d 620, 625 (Tex. App.—Fort Worth 2004, pet. denied) (quoting *Broders v. Heise*, 924 S.W.2d 148, 152–53 (Tex. 1996)); *see Barber*, 303 S.W.3d at 791–92. For this reason, the offered report (along with the physician's curriculum vitae) must generally demonstrate that the expert has "knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Ehrlich*, 144 S.W.3d at 625 (quoting *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003)); *see* Tex. R. Evid. 702; *Barber*, 303 S.W.3d at 792.

However, "there are certain standards of medical care that apply to multiple schools of practice and any medical doctor." *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.). If the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. *Broders*, 924 S.W.2d at 152; *Barber*, 303 S.W.3d at 72 (holding that anesthesiologist who had participated in hundreds of cardiothoracic surgeries could testify to proper padding and positioning techniques for which a general surgeon should have knowledge). Therefore, a physician "who is not of the same school of medicine [as the defendant] . . . is competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant." *Ehrlich*, 144 S.W.3d at 625; *see also Marling v. Maillard*, 826 S.W.2d 735, 740 (Tex. App.—Houston [14th Dist.] 1992, no writ).

8

The proper inquiry concerning whether a doctor is qualified to testify is not his or her area of practice but rather the doctor's familiarity with the issues involved in the claim before the court. *Foster v. Richardson*, 303 S.W.3d 833, 843 (Tex. App.—Fort Worth 2009, no pet.) (holding that internist specializing in physical medicine and rehabilitation could provide expert report against orthopedist in case involving delayed diagnosis of ankle injury and resulting prolonged pain); *Blan*, 7 S.W.3d at 745 (holding that neurologist could provide expert report against cardiologist and emergency room doctors indicating that the standard of care for treating a stroke patient is the same for all doctors).

### Dr. Tabler's Report

Dr. Tabler is a board-certified psychiatrist who at the time of authoring his report had been practicing almost twenty-four years, twenty of those years in private practice. At the time he authored the report, he was the Medical Director of the Behavioral/Medicine Unit of Kindred Hospital, Medical Director of IOP Senior Perspectives, Medical Director of the Gero-Psychiatric Unit of Ten Broeck Hospital, and a consultant to the Pathways Brain Injury Unit, Christopher East Healthcare Center in Louisville, Kentucky. His primary practice area was in psychopharmacology. He had previously served as the medical director of a different hospital's behavioral health unit and as medical director of Ten Broeck Hospital's acute unit; he had also worked as a consultant for several different health

9

care programs, as an attending physician at the Kentucky Correctional Center, and as a clinical faculty member at the University of Louisville psychiatry department.

Dr. Tabler concluded that the negligence of all the physicians and staff who saw Tutt at Millwood, Arlington Memorial, and North Hills "was a proximate cause of [her] injuries and permanent brain damage." He noted that Dr. Ohman saw Tutt for a "pediatric internal medicine consultation" while she was at North Hills. The pertinent parts of Dr. Tabler's report follow.

Dr. Tabler stated that when Tutt was admitted to Millwood, doctors diagnosed her with "major depressive disorder with psychosis." Her prescriptions for Concerta, Seroquel, and Zoloft were continued at the hospital, and doctors additionally prescribed her Haldol, Ativan, and Benadryl. On Tutt's second day at Millwood, she had a temperature of 100.2, was lethargic during group therapy, and appeared to fall asleep at times during therapy. Two days later, she became "acutely confused" and fell, suffering soft tissue damage on her face and head, and precipitating her transport to Arlington Memorial.[2]

After Tutt's mother, Menefee, moved her from Arlington Memorial to North Hills, the staff at North Hills noted that Tutt was "feverish with an unstable blood pressure." One of the doctors who initially saw her—when she was running a fever of 102—assessed Tutt as having an "[a]ltered [m]ental [s]tatus . . . , likely cause may

---

[2] The doctors at Millwood discontinued the Seroquel and started Tutt on Abilify.

10

be secondary to her psychiatric medications side effects like Neuroleptic Malignant Syndrome." The doctor recommended monitoring Tutt in the emergency room.

Dr. Tabler notes the following about Dr. Ohman's examination of Tutt:

> On March 2, 2007 [Tutt's second day at North Hills] at 11:59 a.m., the patient had a pediatric internal medicine consultation by [Dr. Ohman]. After receiving a history of a fall at Millwood following administration of medications, including Haldol and Benadryl. [sic] He states that "during the fall, she was also found to have been incontinent and had an episode of emesis [vomiting]. Since that point she has been unresponsive to painful stimuli." Dr. Ohman further noted that the patient was "drooling" and "will not speak." His impression was: "We have a 16 yr. old girl with mental status changes following medication adjustments over at Millwood. *The patient has had a negative electroencephalogram which makes seizure and postictal state unlikely*. She has had a lumbar puncture and multiple cultures are pending. She is also on a great deal of antibiotics as we await those cultures. I am not aware of any pediatric syndrome that would explain this situation. *I guess that she is reacting to her medications that were given to her and that she will probably continue to be in this state until the medications wear off*." Dr. Ohman's plan at this time was stated as follows: "I have gone ahead and ordered four point restraints for her since she is not responding to commands and she was getting out of bed. I agree with all the tests that have already been ordered. I am going to look to see if maybe a sed rate and ANA have been done just to make sure that we have not missed some sort of unusual autoimmune disease presentation. *However, I think our best bet is to go ahead and support her and give a chance for the medications to wear out of her system*."

Dr. Tabler concluded his review of the facts as follows:

> Evolla Tutt suffered a major catastrophic neurologic event(s) from which she has never recovered. She now requires complete around-the-clock care. During her stay at Millwood and directly related to her care at Millwood, the chain of event was initiated. This negligent chain of events continued at AMH and NHH and eventually left her with a permanently altered mental state, bowel and urinary incontinence, nystagmus, and spastic paralysis. *The negligence by the physicians*

11

*and staff at all three hospitals . . . as detailed herein was a proximate cause of Evolla's injuries and permanent brain damage.* [Emphasis added.]

Under the heading, Familiarity With The Standard of Care, Dr. Tabler opined,

*As a board-certified psychiatrist, I am consulted by others to evaluate patients and to make treatment recommendations for similar cases as Evolla Tutt.* I have knowledge of the accepted standard of care for the diagnosis, care and treatment of the illness, injury or conditions, and am qualified based on training and experience to offer the standard of care expert opinions expressed herein. I am familiar with the standard of care of a reasonable and prudent physician for evaluation and treatment of major depressive disorder with psychotic features, schitzo-affective disorder and/or schizophrenia.

I am practicing medicine at the time this expert report was drafted and was at the time the patient's injury occurred in the fields of psychiatry and neuropharmacology. From September 2006 to the present, I have served as the medical director of the Behavioral/Medicine Unit of Kindred Hospital in Louisville, Kentucky, *managing the treatment of a broad range of psychiatric emergencies and disorders, and working closely with other disciplines providing emergent, intensive and long-term care to our patients. . . .*

By way of my education, training, independent research and professional experience, *I have knowledge of the accepted standards of care for the diagnosis, care and treatment of medical emergencies arising in patients during the treatment of inpatient/acute psychiatric disorders, as in this particular case. . . .*

During the course of my practice in the field of psychiatry and neuropharmacology, I work closely with physicians practicing in the fields of *internal medicine*, neurology, toxicology, *emergency medical care*, pharmacology and pulmonary medicine, as well as registered nurses, licensed professional counselors and physicians' assistants working under my supervision. *The effects of the various psychoactive substances routinely utilized to treat psychiatric disorders implicate all of these disciplines due to the great importance of balancing the associated risks of psychiatric medicines with the purported benefits. In the course of caring for patients, I have therefore developed*

12

*expertise in these related disciplines in order to effectively recognize and appropriately treat adverse reactions to medications and other medical complications when and if they arise.*

My training and publications in psychiatry, psychotropic medications, depression, seizure, brain injury, neuropharmacology and related fields allow appropriate background and experience to express an opinion on the causes relating to the multiple standards of care in this case. *Standards of care in this case cross practice areas — there are many aspects of medical treatment that cross practice specialty areas and in such situations, the appropriate standard of care will be the same for most providers regardless of their specialties. . . .* [Emphasis added.]

After explaining his familiarity with the standard of care, Dr. Tabler explained the relevant conditions at issue. According to Dr. Tabler, these are

• **Neuroleptic malignant syndrome**: This is a potentially-fatal brain and bodily disorder with sequelae requiring active medication treatment if suspected to prevent complications. The classic triad involves the autonomic nervous system (fever in 100%), the extrapyramidal system (rigidity) (tremor), and cognitive changes. . . .

• **Epileptic Seizure**: An epileptic seizure is a transient symptom of abnormal, excessive or synchronous neuronal activity in the brain. It can manifest as an alteration in mental state, tonic or clonic movements, convulsions, and various other psychic symptoms. The medical syndrome of recurrent, unprovoked seizures is termed epilepsy, but seizures can occur in people who do not have epilepsy.

• **Status epilepticus**: This refers to a life-threatening condition in which the brain is in a state of persistent seizure that will not stop without intervention.

Dr. Tabler set forth a lengthy standard of care paragraph applicable to all physicians at North Hills, as well as a shorter paragraph specific to each physician.

The general paragraph reads as follows:

13

Evolla Tutt presented upon admission at North Hills Hospital as a patient with suspected seizure activity who had recently been administered both atypical and first generation antipsychotics, both of which are known to reduce the patient's seizure threshold.  Due to the patient's elevated temperature, reported history from her mother and possibly other sources, recent drug regimen and non-responsiveness, Neuroleptic Malignant Syndrome (NMS), central nervous system infection including possible pathogen-induced encephalitis, serotonin syndrome, catatonic schizophrenia, thyreotoxic crisis and possibly acute neuroleptic intoxication would properly have been considered possible explanations for her health condition in a differential diagnosis.  Irrespective of the ultimate cause of the patient's condition, the standard of care required North Hills Hospital and the medical care providers treating Ms. Tutt at that facility to immediately come to the conclusion that the risk for the patient of continued seizure activity far outweighed any risks associated with the administration of prophylactic anticonvulsants.  <u>North Hills Hospital's failure to adequately buffer Ms. Tutt's defenses against seizure in this instance and abate her rapidly deteriorating health status post-Millwood and Arlington Memorial's substandard treatment caused the patient to suffer many more seizures, which to a reasonable degree of medical probability were a producing cause of the substantial brain damage that has permanently disabled her</u>. . . .

As to the specific alleged standard of care applicable to Dr. Ohman, Dr. Tabler

opined,

> Dr. Ohman began treating the patient on March 2 at North Hills Hospital at 9:51 A.M. *in his capacity as a consulting pediatrician*.  Dr. Ohman failed the patient while she was under his care at the North Hills Hospital facility, contributing to Ms. Tutt's injuries.  Dr. Ohman owed the patient in an acute care setting the duty of immediate and sufficient medical response to her condition in order to prevent brain damage.  The patient was admitted with suspicion of recent seizure activity and Neuroleptic Malignant Syndrome (NMS) following recent increases in her antipsychotic medications at Millwood Hospital, per the history provided by the patient's mother.  Dr. Ohman notes the following:
>
> > [Here, Dr. Tabler recites Dr. Ohman's notes indicating his knowledge of her history of medications, subsequent confusion

14

and fall, and her condition at Arlington Memorial, as well as the results of his examination.]

Dr. Ohman breached his standard of care by failing to immediately prescribe prophylactic anticonvulsants in sufficient dosages to prevent further seizures, given the history of the patient upon admission.  To a reasonable degree of medical probability, this failure by Dr. Ohman to intervene at this early point in the patient's treatment at North Hills Hospital contributed to her continued seizures and ultimate brain damage.  [Emphasis added.]

### Dr. Tabler Is Qualified To Render Expert Report

Dr. Ohman contends that Dr. Tabler's report is deficient because Dr. Tabler does not indicate that he has ever participated in the provision of pediatric care to a patient such as Tutt.  Specifically, Dr. Ohman contends that his "limited pediatric consulting role in this case require[s] that the allegations raised against him be substantiated by an expert who has the qualifications to opine on the treatment provided in that limited role."  He contends that Dr. Tabler does not indicate that he has ever worked with a pediatrician, has practical knowledge of what is customarily or usually done by a pediatrician under similar circumstances, or has any experience treating patients like Tutt.

A pediatrician is a specialist in "the study and treatment of children in health *and disease* during development from birth to adolescence."  Stedman's Medical Dictionary 1446 (28th ed. 2006) (emphasis added).  Reading Dr. Tabler's report as a whole, he clearly indicates that he has experience evaluating and making treatment recommendations for patients "in similar cases as" Tutt's and that his

15

knowledge of the standard of care applies to the emergency treatment of psychiatric patients "as in this particular case." *See Barber*, 303 S.W.3d at 794 (holding that court must not view any one part of expert report or curriculum vitae in isolation). He does not limit this experience and knowledge to a particular age group but to the underlying condition at issue.

Although Dr. Ohman characterizes treatment of Tutt's condition as the provision of pediatric services to Tutt, it is more properly characterized as the evaluation and treatment of a pediatric patient, with an underlying diagnosis of major depressive disorder and psychosis, presenting in an emergency room setting with suspicion of recent seizure activity and neuroleptic malignancy syndrome. Dr. Tabler's training and experience—including his work in both psychiatric and acute care settings—show that he is qualified to render an expert opinion as to the treatment of such a condition. *See Foster*, 303 S.W.3d at 843; *Blan*, 7 S.W.3d at 745–47; *see also Barber*, 303 S.W.3d at 794–96 (concluding that entirety of expert report showed that anesthesiologist was qualified to render expert opinion against general surgeon because report showed anesthesiologist's experience with the type of surgery at issue even though report never stated that anesthesiologist had experience working specifically with general surgeons). And although Dr. Tabler does not specifically mention working with pediatricians in his report, he does state that he has worked specifically with internal medicine specialists and emergency room doctors and that the standard of care for treatment of conditions similar to

Tutt's crosses practice specialties; moreover, he notes in his report that Dr. Ohman performed a pediatric *internal medicine evaluation* of Tutt in the emergency room. Accordingly, we conclude and hold that, reading Dr. Tabler's report in its entirety, he is qualified to render an expert opinion as to the standard of care applicable to Dr. Ohman's treatment of Tutt's condition in this case and, therefore, that the trial court abused its discretion by determining otherwise.

**Articulation of Standard of Care And Breach Are Sufficiently Specific**

In his objections to Dr. Tabler's report, Dr. Ohman also claimed that Dr. Tabler failed to specifically set forth the standard of care applicable to Dr. Ohman as a pediatrician and how Dr. Ohman breached such a standard. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52–53; *Rusk v. Titus Hosp. Dist.*, 128 S.W.3d 332, 340 (Tex. App.—Texarkana 2004, pet. denied). But as set forth above, Dr. Tabler not only set forth a standard of care applicable to all of the physicians at North Hills, he also later specifically described that standard in reference to Dr. Ohman's care of Tutt. He also specifically described how Dr. Ohman allegedly breached that standard of care: by failing to immediately prescribe anticonvulsants for Tutt instead of waiting for the other medications to "wear out of her system." Accordingly, we conclude and hold that the trial court abused its discretion by sustaining this objection to Dr. Tabler's report. *See Davisson v. Nicholson*, No. 02-09-00169-CV, 2010 WL 1137031, at *9–10 (Tex. App.—Fort Worth Mar. 25, 2010, no pet.) (op. on reh'g); *Foster*, 303 S.W.3d at 843.

17

**Sufficiency of Causation Opinion**

Dr. Ohman's final objection to Dr. Tabler's report is that its statements regarding causation are conclusory. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 53. According to Dr. Ohman, this court must engage in impermissible gap-filling to determine how Dr. Ohman's alleged breach of the described standard of care caused Tutt's injuries. Dr. Tabler faults Dr. Ohman for one thing: failing to immediately prescribe anticonvulsant medication to Tutt to stop her seizures. He states earlier in his report that because all of the doctors continually failed to prescribe such anticonvulsant therapy after recognizing the seizure activity, Tutt continued to have seizures as a result of the syndrome caused by the medications she had been given at Millwood, and that the continuation of those seizures caused her resulting brain damage. In other words, Dr. Tabler's report indicates that each doctor failed to prescribe the anticonvulsants, that each failure contributed to more seizures, and that the multiple seizures caused the injury. Therefore, we conclude and hold that this statement of causation is sufficiently specific and not conclusory and that the trial court abused its discretion by granting this objection to Dr. Tabler's report. *See Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 273 (Tex. App.—Fort Worth 2009, no pet.); *Apodaca v. Miller*, 281 S.W.3d 123, 128–29 (Tex. App.—El Paso 2008, no pet.); *Chandler v. Singh*, 129 S.W.3d 184, 191–92 (Tex. App.—Texarkana 2004, no pet.).

Having determined that the trial court abused its discretion by granting Dr. Ohman's objections to Dr. Tabler's report, we conclude and hold that the trial court likewise abused its discretion by dismissing appellants' claims against Dr. Ohman. We sustain appellants' sole issue.

## Conclusion

Having sustained appellants' sole issue, we reverse the trial court's order and remand this case to the trial court for further proceedings on appellants' claims against Dr. Ohman.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  May 27, 2010