

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00350-CV

DONALD L. WASHINGTON, JR., M.D.    APPELLANT

V.

BULMARO ALVAREZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF SANDRA ALVAREZ, DECEASED AND AS NEXT FRIEND OF SARAY ALVAREZ AND MARIA ALVAREZ, MINORS, AND SANDY ALVAREZ, INDIVIDUALLY    APPELLEES

----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Donald L. Washington, Jr., M.D., a pulmonologist, appeals from the trial court's interlocutory order refusing to dismiss the health care liability claims of

---

[1]*See* Tex. R. App. P. 47.4.

appellees Bulmaro Alvarez, individually and as representative of the Estate of Sandra Alvarez, deceased, and as next friend of Saray Alvarez and Maria Alvarez, minors, and Sandy Alvarez, individually. We affirm.

## Procedural Background

Appellant participated in the postoperative care of Sandra Alvarez after she had a hysterectomy. Alvarez died after developing complications from bleeding. Appellees filed an expert report with their original petition asserting health care liability claims against all of the doctors involved in Alvarez's care; appellees filed an amended report four months later in response to appellant's objections. After appellant filed a motion to dismiss, the trial court found that the reports were a good faith effort but were nevertheless deficient for addressing the doctors' breaches as a group. The trial court extended the deadline for serving a sufficient report for thirty days. Appellees filed a second amended expert report; the trial court overruled appellant's objections to that report and denied appellant's second motion to dismiss.

## Standard of Review

A trial court's decision on a motion to dismiss under section 74.351 is subject to an abuse of discretion standard. *See, e.g., Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine*

2

*Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 242. A trial court does not abuse its discretion if it commits a mere error in judgment. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

### Expert Report Requirements

In a health care liability claim, a claimant must serve on each defendant an expert report that addresses standard of care, liability, and causation no later than the 120th day after the claim is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j) (West 2011); *Barber v. Mercer*, 303 S.W.3d 786, 790 (Tex. App.—Fort Worth 2009, no pet.). If an expert report has not been served on a defendant within the 120-day period, then on the motion of the affected defendant, the trial court must dismiss the claim with prejudice and award the defendant reasonable attorney's fees and costs. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Barber*, 303 S.W.3d at 790. A report "has not been served" under the statute when it has been physically served but it is found deficient by the trial court. *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008); *Barber*, 303 S.W.3d at 790–91. When no report has been served because the report that was served was found to be deficient, the trial court has discretion to grant one thirty-day extension to allow the claimant the opportunity to cure the

3

deficiency. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Barber*, 303 S.W.3d at 791.

A report is deficient (therefore subjecting a claim to dismissal) when it "does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*); *Barber*, 303 S.W.3d at 791. While the expert report "need not marshal all the plaintiff's proof," *Palacios*, 46 S.W.3d at 878, it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Barber*, 303 S.W.3d at 791.

To qualify as a good faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875; *Barber*, 303 S.W.3d at 791. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Palacios*, 46 S.W.3d at 879; *Barber*, 303 S.W.3d at 791. The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879; *Barber*, 303 S.W.3d at 791. When reviewing the adequacy of a report, the only

4

information relevant to the inquiry is the information contained within the four corners of the document alone. *Palacios*, 46 S.W.3d at 878; *Barber*, 303 S.W.3d at 791; *see Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Barber*, 303 S.W.3d at 791; *see Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 53).

"[I]t is not enough that the expert report 'provided insight' about the plaintiff's claims. Rather, to constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios*'s two-part test." *Bowie Mem'l Hosp*., 79 S.W.3d at 52 (citation omitted); *Farishta v. Tenet Health Sys. Hosps., Inc.*, 224 S.W.3d 448, 453 (Tex. App.—Fort Worth 2007, no pet.). The expert "must explain the bases of the statements [made regarding causation] and link his or her conclusions to the facts." *Farishta*, 224 S.W.3d at 453–54 (quoting *Longino v. Crosswhite*, 183 S.W.3d 913, 917–18 (Tex. App.—Texarkana 2006, no pet.)). The report must provide enough information within the document to both inform the defendant of the specific conduct at issue and to allow the trial court to conclude that the suit has merit. *Bowie Mem'l Hosp*., 79 S.W.3d. at 52.

### Analysis

In two issues, appellant claims that the trial court abused its discretion by failing to dismiss appellees' claims against him with prejudice because the

amended expert report failed to adequately or sufficiently address the issue of proximate cause with respect to appellant.

The pertinent parts of the expert report show that Alvarez was admitted to the hospital for a vaginal hysterectomy because of "dysfunctional uterine bleeding." Another doctor performed the surgery. In the recovery room, Alvarez had a drop in blood pressure, an increase in pulse, and no urine output. Another pulmonologist and an internal medicine specialist evaluated Alvarez in the recovery room and gave her Hespan and IV fluids, but she did not improve. The pulmonologist diagnosed Alvarez with hemorrhagic shock and recommended aggressive IV fluids, a transfusion, and pressor agents. He also "suggested" that Alvarez would need surgical or radiological intervention, but he did not order or do anything to cause such intervention to occur. The report opines that appellant as well as the other doctors failed to meet the standard of care, which was to recognize the emergency and see that "appropriate intervention" was carried out. When Alvarez was taken back to the operating room, she died in surgery.

Regarding Alvarez's specific diagnosis, the report opines,

> The suspicion of post operative hemorrhage is made when there is an acute drop in hemoglobin out of proportion to intraoperative blood loss, decreased or absent urine output, increased pulse, and decreased blood pressure. The diagnosis is made when the patient does not respond to a fluid bolus. *When the diagnosis is made the only avenue of treatment available is surgical exploration to control the hemorrhage. Continued blood loss and hypotension compromises cardiac output, resulting in hemorrhagic shock, a much more difficult clinical situation to treat and reverse. Failure to treat this condition early in its clinical course with surgery to stop the hemorrhage, increases the risk of a fatal outcome, as*

6

*seen in this case. . . . [M]aintaining blood pressure with the pressor agents exacerbates the hemorrhage much as squeezing a bag of blood with a hole increases the speed of the discharge through the hole, hastening, not slowing the blood loss. Pressor agents are absolutely contraindicated when there is a diagnosis of post-operative hemorrhage. The only way to increase the pressure and salvage the patient is to stop the leak. No other solution will work.* Physicians and nurses taking care of post operative patients . . . in the ICU know this fact and the extreme risks involved to the patient if it is not done. It is inappropriate and below the standard of care for physicians and nurses taking care of a patient in this situation to continue to administer fluids, transfuse blood, and administer pressors without having surgical intervention underway.

The standard of care required both recognizing the emergency and seeing that appropriate surgical intervention is carried out. The delay in recognizing the emergent nature of . . . Alvarez's condition and in insisting that Dr. Allen or some other surgeon effect a surgical repair was below the standard of care. Further, this delay was a proximate cause of . . . Alvarez's death. *Proper standards of care further prohibit the use of pressors as this exacerbates the problem.* . . . [Appellant] failed to . . . insist that such surgery take place either by Dr. Allen or by some other surgeon. . . . [*Appellant*] *continued to order pressors*.

. . . The delay in timely returning . . . Alvarez to surgery to repair the obvious bleed caused her death.

[Emphasis added.]

In another section of the report, Dr. Tyuluman opines,

The standard of care for [appellant], an internist and pulmonologist caring for a post-operative patient like . . . Alvarez in the CCU, is to recognize the emergent and critical post-operative bleed and to insist that Dr. Allen or some other surgeon take her back to surgery in a timely fashion and repair it. [Appellant] was also aware of . . . Alvarez's emergently critical condition. He too took no steps to make sure that Dr. Allen or some other surgeon take . . . Alvarez emergently back to surgery to correct the obvious post-surgical bleed. [Appellant] was paged at 1945. At 2010, he ordered continuation of Dopamine and Neosynephrine and added Levophed. He was again paged at 2015. He was at the bedside at 2019. He

7

ordered bicarbonate for her acidosis. By 2030, [appellant] noted that . . . Alvarez would require "re-exploration", but took no steps to make sure that that happened within the next hour and a half. *This course of conduct was negligence, contributed to the delay and was a proximate cause of . . . Alvarez's death.*

[Emphasis added.]

Finally, Dr. Tyuluman concludes by stating,

The failure of all defendants to provide surgery to control the hemorrhage, continuing to administer pressor agents when contraindicated, failure to properly monitor intraoperative blood loss, and failure to recognize the compromised status of the patient during this process are proximate cause[s] of the death of Alvarez.

Appellant contends that the expert report fails to explain why his delay in meeting the articulated standard of care—ensuring that Alvarez be taken immediately to surgery—proximately caused Alvarez's death when several other doctors had already been treating her for several hours before that. In his brief, appellant argues that the report "improperly leaves the trial court to infer or guess that . . . Alvarez's outcome would have been different at the time [he] initially saw her, and something occurred of medical significance between the time [appellant] first saw . . . Alvarez at 20:19, and 20:42, when Dr. Allen [her surgeon] made the decision to take her to surgery and repair the bleed."

The report states that Alvarez was taken to the PACU[2] at 1302 and was hypotensive[3] at that time. The expert opined that at 1503, Alvarez's bleed was

---

[2]Post-anesthesia care unit.

[3]Low blood pressure.

8

obvious and she needed to be immediately returned to surgery. Dr. Allen decided to take Alvarez back to surgery at 2042, but he did not actually take her back until 2200. Although appellant characterizes his treatment of Alvarez as being for only "a few minutes" within the approximately nine hours Alvarez was treated postoperatively, the timeline in the expert report shows that he was involved in her treatment for over two hours before she was actually taken to surgery.

Moreover, Dr. Tyuluman's report also faults appellant for continuing to prescribe pressors when they were "absolutely contraindicated," and he explains that the use of such pressors exacerbated the bleeding that Alvarez was already experiencing, actively contributing to the worsening of her condition rather than passively being involved in the delay. Thus, according to Dr. Tyuluman's report, appellant's entire "course of conduct" was a proximate cause of Alvarez's death. Proximate cause need not be sole cause; one doctor's actions can be part of a chain of events that all combine to be a substantial factor in causing a patient's injury or death. *See, e.g.*, *Presbyterian Cmty. Hosp. of Denton v. Smith*, 314 S.W.3d 508, 519 (Tex. App.—Fort Worth 2010, no pet.); *Patel v. Williams ex rel. Estate of Mitchell*, 237 S.W.3d 901, 905–06 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("While there are many links in this chain of causation, we cannot conclude that Dr. Zeitlin's report is insufficient to fulfill the requirements of section 74.351.").

Appellees argue that this case is similar to *Menefee v. Ohman*, 323 S.W.3d 509 (Tex. App.—Fort Worth 2010, no pet.). In that case, Dr. Ohman was

9

one of several doctors who treated a sixteen-year-old girl who suffered brain injuries after being given antipsychotic medication. *Id.* at 515–16. The expert opined that each doctor in the chain proximately caused the girl's injuries by failing to prescribe anticonvulsant therapy; we held that the expert's causation opinion was sufficient under section 74.351. *Id.* at 519–20. Appellant contends *Menefee* is inapposite because Dr. Ohman had provided care to his patient for "hours," but appellant treated Alvarez for only "a few minutes." But this is a distinction without a difference. As we have explained, Dr. Tyuluman contends that appellant's continued prescription of pressors, which contributed to the bleed for almost two hours before Alvarez actually went back to surgery, was a proximate cause of Alvarez's death. Thus, contrary to appellant's contentions, the expert report in this case is much like the sufficient one in *Menefee*.

Appellant is arguing, in effect, that for Dr. Tyuluman's report to be sufficient under section 74.351, he should have opined as to the exact moment surgical intervention would have outweighed the effect of the continued use of pressors. But such detail is not required at this stage of the litigation. *See Kelly v. Rendon*, 255 S.W.3d 665, 677 n.6 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Dr. Tyuluman's report was sufficient to inform appellant of the specific conduct that appellees contend was a proximate cause of Alvarez's death. Whether that evidence is sufficient to actually prove causation is an issue for trial. *See Palacios*, 46 S.W.3d at 879.

We overrule appellant's two issues.

10

## Conclusion

Having overruled appellant's two issues, we affirm the trial court's order. [4]


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED: July 7, 2011

---

[4]This court's November 30, 2010 order staying discovery in the trial court remains pending until disposition of the motion for rehearing in appeal number 02-10-342-CV.

11